Filed 8/27/13  P. v. Atkins CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C070154 |
| Plaintiff and Respondent, | (Super. Ct. No. 10F03637) |
| v. | |
| GREGORY JAMAR ATKINS, | |
| Defendant and Appellant. | |

Defendant Gregory Jamar Atkins molested the daughter and son of friends with whom he lived on and off.  An information charged defendant with four counts of oral copulation on a child 10 years of age or younger, attempted sexual intercourse with a child 10 years of age or younger, and three counts of forcible lewd and lascivious acts on a child under the age of 14.  (Pen. Code, §§ 288.7, subd. (b), 664/288.7, subd. (a), 288, subd. (b)(1).)[1]  A jury found defendant guilty on all counts.  Sentenced to 45 years to life plus a consecutive term of 19 years in state prison, defendant appeals, requesting this

---

[1]  All further statutory references are to the Penal Code unless otherwise indicated.

1

court review the school records of one of his victims to determine the scope of discovery, contending the prosecution committed misconduct, and alleging sentencing error. We shall remand for a reconsideration of consecutive sentences on counts six and seven. In all other respects, the judgment is affirmed.

## FACTUAL AND PROCEDURAL BACKGROUND

**The Victims**

A.D., who was 13 years old at trial, and M.D., age 10 at trial, are the daughter and son, respectively, of L.P. and J.K. The couple also have two other children, ages six and one at trial. Defendant has two children with A.D.'s aunt (the children's aunt).

Defendant lived with A.D. and her family in the past. He had been in A.D.'s life as long as she could remember, and she thought of defendant as her uncle.

### *Molestations of A.D.*

A.D. testified that defendant touched her in her "private part" with his hand and mouth. Defendant touched her under her clothing. Defendant touched A.D.'s private with his "private." He tried to put his private into A.D.'s private but was unsuccessful. When he tried to put his private in her private it hurt. On more than one occasion, A.D. saw "something come out of [defendant's] private."

The molestations began when A.D. was five and living in the New Helvetia apartment complex with her family and defendant. The touching happened "[a] lot" and also took place at the home of the children's aunt.

As a prelude to the molestations, defendant would send A.D.'s brothers outside and call A.D. into a room. On one occasion, the touching took place at the children's aunt's home; defendant sent A.D.'s brothers and cousins outside and then called A.D. into her aunt's room. After A.D. went into the room, defendant started touching her. Defendant removed A.D.'s clothes and touched her private parts with his mouth, holding her down on her aunt's bed.

2

Defendant also touched A.D. this way when she lived in a house on Twin Road. Although A.D. initially could not recall being touched at a 6th Parkway apartment where she had lived, she recalled an incident after being shown a photograph of the apartment. Defendant touched her with his private while in her room. On another occasion defendant put his penis in A.D.'s mouth.

A.D. recalled an incident at the 6th Parkway apartment in which defendant woke her up. After A.D. went to the bathroom, she returned to her room to find defendant standing there. She got into bed, pulling up the covers. Defendant pulled off the covers and began touching her. He removed A.D.'s clothes and put his mouth on her private part before trying to put his private in her private.

While living at the New Helvetia apartment, defendant touched A.D. while they were in his room. Defendant also showed A.D. videos of naked people doing "[n]asty stuff."

When defendant touched A.D. he held down her arms to prevent her from moving. After he touched her, defendant gave her money so she would not tell anyone what happened. Defendant told A.D. that if she told anyone about the incidents he would kill her.

### *Molestations of M.D.*

A.D. saw defendant commit sexual acts with her brother M.D. Once, when A.D. walked into her great-aunt's house, she saw M.D. kneeling down with his mouth on defendant's private.

M.D. testified that defendant put his privates in M.D.'s mouth. This happened more than once, and M.D. did not say anything because he was scared. Defendant would push M.D.'s head down so M.D. could not get away. M.D. also testified about witnessing defendant with a cover over his privates; A.D. was under the covers with her head "moving up and down."

3

**Discovery**

A.D. developed a rash on her privates and told her mother. A.D.'s mother asked her if someone was touching her. A.D. told her mother about defendant, and her mother grabbed a knife and went to confront defendant at A.D.'s great-aunt's house. A day later A.D. spoke with the police.

**Interviews with Child Abuse Unit**

The case was later assigned to Detective Carol Mims. After Detective Mims reviewed the police report, she scheduled a special assault forensic evaluation (SAFE) interview for A.D. and M.D. The two children were interviewed on May 24, 2010. A video of the interview was played for the jury.

During the SAFE interview, A.D. stated she told her mother about the touching after she developed a rash. Defendant had been touching A.D. since she was five years old. He put his tongue on A.D.'s private parts and told her if she told anyone he would kill her. He also gave A.D. money.

A.D. also described incidents at the 6th Parkway apartment, including the incident in which defendant woke her up and molested her after she returned from the bathroom. Defendant put his tongue on her private and held her down to prevent her moving. Something white came out of defendant's private.

In addition, A.D. described an incident at the home of the children's aunt, when defendant put his tongue in A.D.'s private and then put his private into her private. Defendant had sent her brothers and cousins outside to play before molesting her. He then pulled down A.D.'s pants and put his tongue in her private. He held her down and tried to put his private on A.D.'s private. Defendant then put his tongue back on A.D.'s private. He gave A.D. money and told her he would kill her if she told anyone what happened.

During the interview, A.D. also discussed an incident when she was five and living in the New Helvetia apartment. Defendant, who lived with her family, called A.D.

4

into his room and put his tongue on her private. He told her he would kill her if she told anyone.

A.D. estimated defendant molested her 19 times while she lived at New Helvetia. Defendant molested her two more times at the children's aunt's home, two more times at her old home, and one time at her new home.

A.D. described defendant's molesting M.D. by putting his privates in her brother's mouth. She also stated defendant showed her videos of naked people.

During M.D.'s SAFE interview, a video of which was also shown to the jury, he stated defendant molested him more than once. M.D. described defendant's waking him up and making him "suck his privates." Defendant would pull his pants down and stand by M.D.'s bed. He would tell M.D. he would give him money when he was done and then he would push M.D.'s head down onto his private part. M.D. also saw defendant do the same thing to his sister A.D.

**Medical Examination**

Dr. Jason Leu examined A.D. after she reported the rash in her vaginal area. A.D. told Leu she had had some vaginal bleeding because defendant "had tried to penetrate her vaginal area." The molestations began when A.D. was five.

Leu's external examination of A.D. revealed lesions at A.D.'s vaginal opening. A.D.'s urine test showed she had chlamydia; her blood test showed signs of syphilis. A.D. also suffered from a yeast infection. Based on these results and A.D.'s age, Leu concluded she had been sexually abused. Tests for sexually transmitted diseases proved negative for M.D. at his initial examination.

A SAFE nurse performed forensic examinations of both children. The results could neither confirm nor negate sexual abuse.

A.D. and M.D. were retested for syphilis and chlamydia: A.D. tested positive for both and M.D. tested positive for syphilis. The SAFE nurse explained that the syphilis retest was necessary because of the incubation period of the disease.

5

The nurse testified neither disease could be transferred by sharing clothing or contact with toilets. Syphilis can only be transmitted through sexual contact. In 2010, out of 56 reported cases of syphilis in Sacramento County, only three involved individuals under the age of 19. In July 2010 defendant tested positive for syphilis.

**Child Sexual Abuse Accommodation Syndrome**

Dr. Anthony Urquiza, a psychologist, testified regarding child sexual abuse accommodation syndrome. Urquiza testified the syndrome is an educational tool used to help dispel misperceptions about sexual abuse.

Five categories characterize the syndrome: secrecy, helplessness, entrapment and accommodation, delayed and unconvincing disclosure, and retraction. Secrecy describes the abuser's relationship with the victim and the effort to silence the child. Helplessness refers to the child's vulnerability to the abuser. Entrapment and accommodation refer to the child's ensnarement in the relationship and the child's efforts to cope with the experience. Delayed and unconvincing disclosure describes the abused child's reluctance to report the abuse immediately and tendency to later recant the allegations.

**Defense Case**

Defendant testified in his own behalf. He was a childhood friend of A.D. and M.D.'s father. When defendant first moved to Sacramento from Louisiana he renewed their acquaintance. After a time, defendant moved into the New Helvetia apartment with the family. Defendant had little contact with A.D. He lived with the family for approximately six months and then returned to Louisiana.

Defendant came back to Sacramento in 2004 and moved in with the children's great-aunt; he later lived with the children's aunt in an apartment on Sky Parkway. A.D. and her family subsequently moved into the Sky Parkway apartment. In 2006, after "things [started] getting kind of crazy" at the Sky Parkway apartment, defendant moved briefly to San Francisco. He returned to the apartment later that year.

6

Defendant moved into his own apartment in Spartan Village. A.D. and her family later moved in with defendant for about a year. Nothing inappropriate took place with A.D. or M.D. during this time; he did not see the children very often.

Defendant moved to the Sunny Slope apartments. A.D.'s parents moved in with defendant, but A.D. and M.D. did not. In 2008 defendant moved back in with the children's aunt for a couple of months, then moved to North Sacramento. In 2009 defendant moved in with the children's great-aunt and became her care provider.

Some months later, defendant and the children's great-aunt moved back to Spartan Village. While living there, defendant occasionally spent the night at A.D.'s family's home on 6th Parkway. Defendant denied doing anything inappropriate at the Sky Parkway residence or at the Spartan Village apartment.

Defendant first learned of the children's allegations when their mother L.P. came to his apartment, armed with a knife. Defendant went to A.D.'s apartment to respond to the charges. When A.D.'s father J.K. arrived, he told defendant to leave. Defendant left.

J.K. later told defendant to return to Louisiana. Defendant refused since he had not done anything wrong. However, defendant changed his mind after some of L.P.'s family members tried to "jump" him.

Defendant bought a bus ticket to Louisiana and also visited his brother in Arkansas. Police arrested defendant in Arkansas. After his return to Sacramento, defendant learned of M.D.'s allegations against him.

While he lived in California, defendant testified he had a problem with alcohol, and used marijuana and Ecstasy. Although defendant admitted watching pornography, he testified he did it alone. Defendant stated he saw A.D. and M.D. watching pornography in the presence of their parents, who were "passed out."

According to defendant, A.D. and L.P. stole money from him when he passed out in his room. Defendant admitted giving M.D. and A.D. money for ice cream but did not give A.D. money to buy her silence. He did not threaten to kill her.

7

Defendant did not molest A.D. or M.D.  However, defendant acknowledged telling a detective that if he molested either child it was "because [he] was drunk and high." Defendant also testified he "probably" told the detective that if he tested positive for syphilis, he would have to "own up" to what he did.

**Aftermath**

An information charged defendant with four counts of oral copulation on a child 10 years of age or younger (counts one, two, five, & eight), attempted sexual intercourse with a child 10 years of age or younger (count three), and three counts of forcible lewd and lascivious acts on a child under the age of 14 (counts four, six, & seven).  The information also alleged defendant committed the offenses against two or more victims. (§ 667.61, subd. (e)(5).)  Defendant entered a plea of not guilty.

The jury found defendant guilty on all counts and found the special allegation true. Count one and the special allegation as to that count were dismissed on the People's motion because the statute did not exist at the time of the offense.

The court sentenced defendant to 45 years to life in state prison plus a consecutive term of 19 years:  15 years to life on counts two, five, and eight, and the middle term of seven years on count three, the middle term of six years on count six, and the middle term of six years on count seven.  The court imposed a six-year sentence on count four, which was stayed pursuant to section 654.  Defendant filed a timely notice of appeal.

## DISCUSSION

## REVIEW OF SCHOOL RECORDS

Defendant asks us to independently review A.D.'s school records in order to determine whether there were items the trial court should have disclosed following its in camera review of A.D.'s records.  Defendant asks us to determine whether the school records contain information relevant to A.D.'s credibility.  We granted defendant's motion to augment the record with the sealed documents.  The People do not oppose the request.

8

**Background**

Prior to trial, defense counsel requested that the trial court review A.D.'s school records in camera for any exculpatory, material, and/or relevant admissible evidence. The trial court found sufficient cause to inspect the school records. The court's review of the records revealed no records "that should properly be disclosed to the defense."

**Discussion**

Education Code section 49076 limits access to a student's school records. A review of these records requires either written parental consent or a court order, unless the request qualifies under certain exceptions. (*Ibid.*)

Confidentiality gives way when the requested information facilitates the pursuit of facts and the goal of a fair trial. (*Pitchess v. Superior Court* (1974) 11 Cal.3d 531, 536.) Confidential files may be disclosed if defense counsel makes a plausible justification for disclosure or a good cause showing of a need for the documents. (*Alford v. Superior Court* (2003) 29 Cal.4th 1033, 1045.) The trial court reviews the confidential documents in camera to determine whether or not disclosure is warranted. (§ 1326, subd. (c).)

In turn, we review the confidential records the trial court declined to disclose to determine whether they are material and should have been disclosed. Such evidence is material only if there is a reasonable probability that had the evidence been disclosed, the result of the trial would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the trial. (*People v. Martinez* (2009) 47 Cal.4th 399, 453-454.)

Our review of the confidential records reveals no material evidence that should have been disclosed to the defense.

## PROSECUTORIAL MISCONDUCT

Defendant argues the prosecutor committed misconduct during closing argument. According to defendant, the prosecutor vouched for the credibility of A.D. and M.D. by referring to facts not in evidence. These comments, defendant contends, prejudiced him.

9

**Background**

During closing argument, the prosecutor addressed inconsistencies between A.D.'s and M.D.'s interview testimony and the testimony they gave at trial. The prosecutor referenced comments by defense counsel during opening statements concerning "how children are gonna [*sic*] react to having to testify." The prosecutor referenced Dr. Urquiza's testimony "that the environment kids are in greatly affects their ability to give accounts of what happened to them."

The prosecutor referred to a sexual assault training seminar one of her colleagues attended. Defense counsel objected. After the court overruled the objection, the prosecutor stated: "And before one of the lunch breaks the instructor said to the class, okay, when you all get back from lunch I'm gonna [*sic*] call on one of you and I'm gonna [*sic*] ask you about your last sexual experience, who it was with, where it happened, details, foreplay, positions. [¶] Okay. Have a good lunch."

Defense counsel objected and the trial court overruled the objection. The prosecutor continued: "As you can imagine, half the class didn't even come back, but my colleague did, and he sat there staring at his feet thinking, I cannot do this. [¶] And that's when he heard the instructor say, you all are sitting there imagining how hard it would be to talk about your last sexual experience. [¶] I'm gonna [*sic*] assume that was a consentual [*sic*] one. Now think about talking about it, talking about a sexual experience that was forced on you with a person who forced it upon you sitting 15 feet away from you. [¶] These kids testified to the best of their ability, but their testimony has been filtered by a year and a half of trying to forget."

**Discussion**

A prosecutor's conduct violates the federal Constitution when it comprises a pattern of conduct so egregious that it infects the trial with such unfairness as to deny the defendant due process. Prosecutorial conduct that does not render a criminal trial fundamentally unfair is prosecutorial misconduct under state law only if it involves the

use of deceptive or reprehensible methods to attempt to persuade either the court or the jury. (*People v. Samayoa* (1997) 15 Cal.4th 795, 841 (*Samayoa*).)

As a general rule, a defendant must object to the prosecutor's misconduct and request an admonition when the misconduct occurs. (*Samayoa*, *supra*, 15 Cal.4th at p. 841.) The defendant's failure to object or request an admonition is excused if either it would be futile or an admonition would not have cured the harm caused by the misconduct. (*People v. Alfaro* (2007) 41 Cal.4th 1277, 1328.)

A prosecutor commits misconduct by invoking his or her personal prestige or experience in an effort to bolster the case against a defendant. (*People v. Riggs* (2008) 44 Cal.4th 248, 302.) It is misconduct for a prosecutor to refer to matters not in evidence unless they are matters of common knowledge or drawn from common experience. (*People v. Cunningham* (2001) 25 Cal.4th 926, 1026.) Moreover, it is improper for the prosecutor to vouch for the veracity of witnesses by reference to facts outside the record. (*People v. Williams* (1997) 16 Cal.4th 153, 257 (*Williams*).)

Here, the prosecutor referred to a seminar on abuse of children attended by a colleague. The seminar sought to explain the inability of children to recall an incident of abuse by asking participants to recall their consensual sexual encounters.

According to defendant, the seminar instructor, the colleague, and the prosecutor herself were all unsworn witnesses whom defendant could not cross-examine about the details of this experiment. The seminar instructor, defendant argues, was impliedly some sort of expert in the field of child abuse, an expert defendant could not cross-examine. In essence, the prosecutor committed misconduct by injecting facts not in evidence into closing argument in an effort to "explain away" inconsistencies in the children's testimony, thereby bolstering their credibility.

The prosecutor's comments came during closing argument. The trial court instructed the jury that "Nothing that the attorneys say is evidence. In their opening

11

statements and closing arguments, the attorneys discuss the case, but their remarks are not evidence." (CALCRIM No. 222.)

Here, the prosecutor provided the anecdote about a seminar to explain the discrepancies between the children's testimony during the SAFE interviews and their trial testimony. In the process, the prosecution did not introduce "new evidence" to bolster the children's credibility, but instead attempted to provide an example of faulty memory that the jurors could either accept or reject.

The prosecution enjoys wide latitude to discuss and draw inferences from the evidence at trial; whether those inferences are reasonable is for the jury to decide. (*People v. Dennis* (1998) 17 Cal.4th 468, 522.) The prosecution's argument may be vigorous as long as it amounts to a fair comment on the evidence, including reasonable inferences and deductions drawn from that evidence. (*Williams*, *supra*, 16 Cal.4th at p. 221.) The seminar anecdote amounted to just such fair comment and did not constitute prosecutorial misconduct.

## CONSECUTIVE SENTENCES UNDER SECTION 667.6

Defendant argues the consecutive terms imposed on counts six and seven should be reversed because the prosecution failed to plead and prove enhanced sentencing under section 667.6. According to defendant, "The information alleged that [defendant] committed eight separate violations of the Penal Code, but mentioned nothing about sentencing [defendant] to full-term consecutive sentences. [Citation.] Accordingly, the trial court therefore lacked the authority to impose the full consecutive sentences." The imposition of full-term sentences under section 667.6, defendant argues, constitutes a sentencing enhancement.

### Background

The information charged defendant with attempted sexual intercourse with a child 10 years of age or younger, count three, and three counts of forcible lewd and lascivious acts on a child under the age of 14, counts four, six, and seven. A.D. was the victim

12

named in all four counts.  The court sentenced defendant to consecutive terms:  the middle term of seven years on count three, the middle term of six years on count six, and the middle term of six years on count seven.

**Discussion**

Section 1170.1, subdivision (e) states that all "enhancements shall be alleged in the accusatory pleading and either admitted by the defendant in open court or found to be true by the trier of fact."  Defendant asserts the imposition of full-term consecutive sentences under section 667.6 constitutes a sentencing enhancement.

Section 667.6, subdivision (c) states:  "In lieu of the term provided in Section 1170.1, a full, separate, and consecutive term may be imposed for each violation of an offense specified in subdivision (e) if the crimes involve the same victim on the same occasion.  A term may be imposed consecutively pursuant to this subdivision if a person is convicted of at least one offense specified in subdivision (e).  If the term is imposed consecutively pursuant to this subdivision, it shall be served consecutively to any other term of imprisonment, and shall commence from the time the person otherwise would have been released from imprisonment.  The term shall not be included in any determination pursuant to Section 1170.1.  Any other term imposed subsequent to that term shall not be merged therein but shall commence at the time the person otherwise would have been released from prison."

Subdivision (d) of section 667.6 states, in pertinent part:  "A full, separate, and consecutive term shall be imposed for each violation of an offense specified in subdivision (e) if the crimes involve separate victims or involve the same victim on separate occasions.  [¶]  In determining whether crimes against a single victim were committed on separate occasions under this subdivision, the court shall consider whether, between the commission of one sex crime and another, the defendant had a reasonable opportunity to reflect upon his or her actions and nevertheless resumed sexually assaultive behavior.  Neither the duration of time between crimes, nor whether or not the

13

defendant lost or abandoned his or her opportunity to attack, shall be, in and of itself, determinative on the issue of whether the crimes in question occurred on separate occasions."

In *People v. Reynolds* (1984) 154 Cal.App.3d 796, the court determined any sentence imposed under section 667.6, subdivision (c) was in lieu of any enhancement under section 1170.1; therefore, sentencing under section 667.6, subdivision (c) does not require any further pleading or proof. (*Reynolds*, at p. 810.)

The *Reynolds* court reasoned: "[W]hile the facts giving rise to most enhancements must be charged and found, 'enhancement arising from consecutive sentences result [*sic*] from the sentencing judge's decision to impose them, and not from a charge or finding.' This clearly should be the case with regard to consecutive sentences imposed pursuant to sections 667.6, subdivisions (c) and (d). Those sections only affect the length of the consecutive sentence (whether it is full or reduced). They do not change the fact that the consecutive sentence is imposed for the underlying crime which has clearly been charged in the complaint and information. There is nothing else to charge or find . . . . [Citation.] [¶] Defendant was specifically charged with the crimes for which the consecutive terms were imposed. No further pleading . . . is required." (*Reynolds*, *supra*, 154 Cal.App.3d at pp. 810-811.)

Defendant concedes *Reynolds* refutes his contention that the court erred in imposing consecutive terms on counts six and seven, but argues *Reynolds* was wrongly decided. We do not find defendant's argument against *Reynolds*' reasoning persuasive. The trial court properly sentenced defendant on counts six and seven.

### FULL CONSECUTIVE TERMS ON COUNTS SIX AND SEVEN

Finally, defendant argues that in sentencing him to full consecutive terms on counts six and seven, the court failed to make a finding that the two crimes were committed on separate occasions. Since the two counts involve the same victim, defendant argues, the trial court had to make an express finding that the acts occurred on

14

separate occasions. According to defendant, substantial evidence does not support such a showing.

**Background**

During sentencing, the prosecution requested the upper term on counts three, six, and seven. The prosecutor argued: "The defendant in this case violated a little girl from the time she was five years old, all of the way up through the time that she was 11 and disclosed the abuse. And did so also to a little boy of nine-years-old. And as has been stated, these children thought of him as an uncle. They trusted him. Their entire family trusted him, and not only did he . . . commit horrible acts against them causing them confusion and mental anguish, but also infected both with sexually transmitted diseases."

The court asked the prosecutor if counts six and seven should have full consecutive sentences, and whether such a sentence was at the court's discretion or if the Legislature had mandated consecutive terms.

The prosecutor stated that counts six and seven "would be consecutive, but the Court has the discretion as far as which triad to impose." The court repeated that the offenses required consecutive sentences, and defense counsel stated: "I further agree that Counts Six and Seven which are [section] 288[, subdivision] (b)(1) require mandatory consec[utive] by law." The court imposed a six-year consecutive sentence on count six and an additional six-year consecutive sentence on count seven.

**Discussion**

In count six defendant was charged with placing his "mouth on victim's vagina in [the] bedroom of [the] 6th Parkway apartment" between August 5, 2009, and December 25, 2009. Count seven alleged defendant placed his "penis on victim's vagina in [the] bedroom of [the] 6th Parkway apartment" between August 5, 2009, and December 25, 2009.

Section 667.6, subdivision (d) mandates consecutive sentences "if the crimes involve separate victims or involve the same victim on separate occasions." Under

15

subdivision (d), "[i]n determining whether crimes against a single victim were committed on separate occasions . . . the court shall consider whether, between the commission of one sex crime and another, the defendant had a reasonable opportunity to reflect upon his or her actions and nevertheless resumed sexually assaultive behavior. Neither the duration of time between crimes, nor whether or not the defendant lost or abandoned his or her opportunity to attack, shall be, in and of itself, determinative on the issue of whether the crimes in question occurred on separate occasions."

The People concede that for the section 667.6 mandatory provision to apply, counts six and seven must have taken place on separate occasions. At trial, the evidence revealed that one time at the 6th Parkway apartment, defendant removed A.D.'s clothes and then put his mouth on her private before trying to put his private in her private. During her SAFE interview, A.D. stated defendant had put his mouth on her private for a long time, then removed his boxers and tried to put his private in her private.

The People argue that based on these facts, it was reasonable for the court to determine defendant had the opportunity to reflect between the time he removed his mouth from A.D.'s vagina, stopped to remove his boxers, and then attempted to place his penis into her vagina. We disagree.

Here, there is no evidence of any interval between those sexual acts affording defendant a reasonable opportunity for reflection. Defendant did not cease his assaultive behavior and then resume it. (See *People v. Corona* (1988) 206 Cal.App.3d 13, 18; *People v. Pena* (1992) 7 Cal.App.4th 1294, 1316.)

Since counts six and seven were committed against A.D. on the same occasion, the court in its discretion could impose full-term consecutive sentences under section 667.6, subdivision (c). However, the court did not indicate it was exercising its discretion in sentencing defendant on counts six and seven. In invoking its discretion during sentencing, the court must indicate it is making a discretionary choice and provide and explain its reasoning. (*People v. Belmontes* (1983) 34 Cal.3d 335, 347.) Therefore, we

16

remand to the trial court to determine whether, in its discretion, full-term consecutive sentences were warranted under section 667.6, subdivision (c).

## DISPOSITION

We remand the matter to the trial court to consider its discretion to impose consecutive sentences on counts six and seven pursuant to section 667.6, subdivision (c). In all other respects, the judgment is affirmed.


                                                   RAYE _____, P. J.


We concur:


_____ MURRAY _____, J.


_____ HOCH _____, J.